2005-NMCA-084

116 P.3d 841

**ANGEL FIRE RESORT OPERATIONS, L.L.C., Plaintiff–Appellant,**

v.

**James B. CORDA, et al.; Lewis Pierce and Betty Pierce; and Pierce Land and Development Co., Defendants–Appellees.**

**Nos. 24,440, 24,947, 24,948.**

Court of Appeals of New Mexico.

April 19, 2005.

Certiorari Denied, No. 29,269, July 7, 2005.

as part of which the Resort purchased the corporation's properties. The bankruptcy documents include the plan of reorganization and the Supplemental Declaration of Restrictive Covenants and Easements (Supplemental Declaration) that fixed annual dues assessments, both of which were at issue in HALO. *See id.* ¶¶ 3–6. They also include Articles of Incorporation of the Association of Angel Fire Property Owners, By–Laws of that organization, and a disclosure statement with exhibits. All together, these comprise more than 200 pages of documents.

{3} The case before us is a consolidation of a number of cases in which the Resort sued various landowners for past-due assessments, the landowners moved to dismiss the suits on the ground that the documents did not allow for suits of this nature, and the Resort cross-moved to strike the landowners' motions, requesting a ruling that the landowners' position be rejected as a matter of law. After reviewing the motion, cross-motion, and attached documents, and after hearing argument and receiving requested findings and conclusions outlining the parties' contentions, the trial court entered judgment for the landowners, dismissing the suits.

{4} Prior to the bankruptcy reorganization, the landowners' properties were subject to covenants that provided:

> Every person who shall become the legal or equitable owner of any lot in the Subdivision by any means, is, by the act of acquiring such title, or by the act of contracting to acquire such title, held to have agreed to pay the Association all charges that the Association shall make in accordance with these Restrictions. If such payment is not made when due, it shall bear interest from the due date at the rate of eight (8) percent per annum. Until paid, such charges together with costs and reasonable attorney's fees required to secure payment thereof, shall constitute a perpetual lien on and against the property charged. The Association may publish the name of a delinquent member and may file notice that it is the owner of a lien to secure payment of the unpaid charge plus costs and reasonable attorney's fees and

Daniel E. Rakes, Angel Fire, NM, Charles K. Purcell, Edward Ricco, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for Appellant.

Thomas A. Simons, IV, Daniel H. Friedman, Simons & Slattery, LLP, Santa Fe, NM, for Appellees.

*OPINION*

PICKARD, Judge.

{1} This case provides us with another opportunity to evaluate and interpret the bankruptcy-related documents of an entity emerging from bankruptcy. *See Home & Land Owners, Inc. v. Angel Fire Resort Operations, L.L.C.*, 2003–NMCA–070, 133 N.M. 733, 69 P.3d 243 (hereinafter *HALO* ) (involving the same entity and different portions of the same documents). The dispute here concerns whether Angel Fire Resort Operations, L.L.C. (the Resort) can sue landowners when those landowners do not pay their annual assessments. The documents designate that the annual assessments are to be used for the upkeep of a ski area, a golf course, and other amenities (the amenities). The trial court ruled as a matter of law that the Resort could not sue, and the Resort has appealed. We reverse.

**BACKGROUND**

{2} As indicated in *HALO,* 2003–NMCA–070, ¶¶ 2–3, 133 N.M. 733, 69 P.3d 243, Angel Fire is a resort community, previously owned by a corporation that underwent bankruptcy reorganization in the mid–1990s,

may foreclose the lien in accordance with the laws of the State of New Mexico.

\* \* \*

## 10. REMEDIES

A. The Association, the Committee or any party to whose benefit these Restrictions inure, including Declarant, its successors and assigns, may proceed at law or in equity to prevent the occurrence, continuation or violation of any of these Restrictions[.]

{5} The analogous part of the Supplemental Declaration provides in paragraph 3:

A. Declarant shall assess and the Property Owner of each Homesite shall pay to Declarant a nonrefundable annual assessment, plus gross receipts tax, if applicable, to be used only for the improvement, maintenance, upkeep, repair and operation of and additions to the Amenities. . . .

B. If any assessment is not paid in full when due, Declarant may charge a late fee of $15 per month and the unpaid portion shall bear interest from the due date at the rate of eight percent per annum. . . .

C. The property Owner's obligations under this Paragraph 3 shall be a covenant running with the land and shall be binding upon the Property Owner and upon all parties having or acquiring any right, title or interest in a Homesite owned by Property Owner. Declarant or the Association, as may be agreed between them, may enforce the provisions of this Paragraph 3.

The Supplemental Declaration is silent in paragraph 3 as to the manner of enforcement, and there is no comparable language to paragraph 10, the Remedies part of the previous covenants, in the Supplemental Declaration.

{6} However, the Supplemental Declaration provides that landowners' rights to use the amenities may be suspended or terminated for failure to pay assessments. And in at least ten other places in the bankruptcy documents, landowners' rights to use the amenities are tied to their payment of assessments. These statements of rights are usually in the form of language indicating that the landowners have rights to use the amenities "upon payment" of yearly dues or assessments. It is on the basis of (1) the presence of an express remedy involving a lawsuit in the prior covenants, (2) the apparent deletion of such an express remedy in the current covenants, and (3) the presence of an express remedy involving suspension of use of the amenities in the current covenants as well as the other bankruptcy documents that the landowners contend that the Resort cannot sue them for past-due assessments.

{7} On the other hand, the Supplemental Declaration, in the paragraph relating to the annual assessment, states that it may be "enforce[d]." The word "enforcement" is used in other places in the Supplemental Declaration, expressly indicating that such enforcement may be by an "action [that] shall be brought within" a certain time or be "forever time barred." In addition, throughout the documents there are references to the landowners' mandatory obligations to pay the assessments. The assessments are termed "required Annual Assessment[s]" and the documents state they "shall be paid" by the landowners. As quoted above, the Supplemental Declaration allows the Association to "enforce" the provisions relating to payment of assessments. The Articles of Incorporation of the Association provide that the Association can "enforce" the covenants set forth in the Supplemental Declaration and can levy assessments and "enforce payment thereof" against the landowners. The Articles of Incorporation also give the Association the right to

file or record liens upon any of the homesites to secure the payment of assessments and obligations due from the owners of said homesites to the Association, and to collect, foreclose or otherwise enforce . . . said liens, and do all things necessary to perfect the filing, enforcement and discharge of said liens.

The By–Laws of the Association permit the Board to levy yearly assessments "and to collect the same." All of this, as explained in the Supplemental Declaration, is because the previous landowners had paid assessments to maintain the amenities such that the Resort's obligation to maintain the amenities and the landowners' obligations to pay assessments

to continue the maintenance of the amenities are property interests that run with the land and that were restated expressly in the Supplemental Declaration as mutual obligations. Finally, the reorganization plan expressly provides that the Resort "shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to carry out the intentions and purposes of, and to give full effect to the provisions of, the Plan." It is primarily on the basis of this express language that the Resort claims entitlement to enforce the yearly assessments by these lawsuits.

## DISCUSSION

{8} It is interesting and somewhat ironic that both parties rely on the *HALO* decision and that each party claims that the other's arguments beg the question or amount to bootstrapping. Specifically, the landowners rely on the portion of the opinion indicating that the bankruptcy documents necessarily reflect negotiations that took place among the parties thereto. *HALO*, 2003–NMCA–070, ¶¶ 16, 30, 133 N.M. 733, 69 P.3d 243. Further, the Supplemental Declaration expressly states that it replaces and supersedes all of the original covenants dealing with assessments and amenities. Thus, the landowners argue that any recognition by the courts of a judicial remedy for nonpayment of the assessments would be contrary to what the parties negotiated for and got, which was a limited remedy of suspension of the right to use the amenities on the occasion of nonpayment of assessments. On the other hand, the Resort relies on that portion of *HALO*, 2003–NMCA–070, ¶ 30, 133 N.M. 733, 69 P.3d 243, indicating that the purpose of the negotiations resulting in the bankruptcy documents was to insure that the debtor emerged from bankruptcy as a profitable enterprise. Thus, the Resort argues that it is not reasonable to view the bankruptcy documents as requiring the Resort to maintain the amenities while the landowners do not have to pay for them, particularly since their presence enhances the value of the landowners' properties, even if the landowners do not use the amenities.

{9} In similar fashion, the Resort relies on the many times the documents use the word "enforce" and provide for various enforce-ment remedies, while the landowners counter with their view that enforcement is limited in the context of nonpayment of the assessments to the expressly stated remedy of suspension of rights to use the amenities. So, too, the Resort argues that it is a common-interest community as explained in the Restatement (Third) of Property—Servitudes, § 6.2(1) (2000) (defining a common-interest community as a real-estate development with individually owned lots that are burdened with a servitude that imposes an obligation that cannot be avoided by nonuse or withdrawal), while the landowners argue that this definition assumes the answer to the very question posed by this appeal. For the reasons expressed below, we believe that the Resort has the better argument.

{10} We begin by discussing the reasons why the Resort's interpretation of the documents is the only reasonable one. We will then address the landowners' specific arguments why the lawsuits should not be allowed.

{11} First, as background, we must repeat the overriding purpose of the bankruptcy documents, which was to settle the disputes between the debtor and creditors in such a manner that the debtor would emerge as an economically viable organization. *See HALO*, 2003–NMCA–070, ¶ 30, 133 N.M. 733, 69 P.3d 243. It is true, as the landowners suggest, that the Resort purchased the assets of the debtor on favorable terms compared to what the creditors claimed they were owed and that the Resort can earn money by marketing the amenities to the general public. But it is also true that the assessment structure adopted in the Supplemental Declaration was intended to provide substantial funds—approximately $2,000,000 per year—to the Resort that would enable the Resort to maintain and further develop the amenities.

{12} Second, the words "enforce" and "enforcement" that are found throughout the Supplemental Declaration and other documents typically involve the bringing of lawsuits. *See, e.g., Patterson v. McLean Credit Union*, 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (indicating, in the context

of 42 U.S.C. § 1981, that in prohibiting discrimination in the enforcement of contracts, a right to enforce a contract "embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race"), *superseded by statute on other grounds as stated in Doe v. Bd. of County Comm'rs,* 783 F.Supp. 1379, 1383 n. 11 (S.D.Fla.1992); *Fortier v. Doña Anna Plaza Partners,* 747 F.2d 1324, 1338 (10th Cir.1984) (speaking of enforcing a contract in terms of suits for breach of contract). We agree with the landowners that these cases do not mean that the words always must mean the bringing of lawsuits, but they lend support to the commonly understood usage of the term.

{13} Indeed, at two earlier places in the Supplemental Declaration, the word "enforcement" is expressly tied to legal actions. The landowners contend that by process of negative inference, the lack of reference to legal actions in other portions of the Supplemental Declaration, specifically the portion dealing with the payment of assessments, means that the drafters of the Declaration meant to exclude legal actions as a remedy for nonpayment of assessments. We cannot agree for two reasons. First, "[w]e may presume that words have the same meaning throughout the contract." *McLane & McLane v. Prudential Ins. Co.,* 735 F.2d 1194, 1195 (9th Cir.1984). Second, the other portions of the Supplemental Declaration do not expressly enumerate the legal actions allowed or disallowed. The Declaration simply states that the Association may "seek enforcement" of the two paragraphs relating to the covenants and gives a time limit within which the Association may bring action.

{14} Moreover, we believe that express language in other portions of the bankruptcy documents provides strong support for construing the express language concerning "enforcement" in the Supplemental Declaration as contemplating legal actions. As noted above, the reorganization plan allows the Resort to seek orders and judgments to carry out the intents and purposes of the plan. And the Association, which can, along with the Resort, enforce the payment of assessments, is expressly allowed to file, record, and foreclose liens to secure the payment of assessments from the landowners. Although the present lawsuits are not suits by the Association for foreclosure of liens, it is difficult to imagine why there would be a provision in the bankruptcy documents allowing such suits if, as the landowners contend is true, the only remedy for nonpayment of assessments is withdrawal of the right to use the amenities.

{15} The foregoing discussion is also consistent with a long line of authority that makes it clear that a suit for damages will lie when there is a breach of an obligation to pay money, at least when such a suit is not expressly excluded in the pertinent documents. "Every breach of contract gives the injured party a right to damages against the party in breach." Restatement (Second) of Contracts § 346 cmt. a (1981); *see also Dacy v. Vill. of Ruidoso,* 114 N.M. 699, 704, 845 P.2d 793, 798 (1992) (citing Restatement (Second) of Contracts § 346(1)). "A servitude may be enforced by any appropriate remedy or combination of remedies, which may include declaratory judgment [and] compensatory damages[.]" Restatement (Third) of Property—Servitudes § 8.3(1) (2000). Moreover, the fact that a contract might include a provision for a nonjudicial remedy does not mean that judicial remedies are thereby excluded. *See Roberson Constr. Co. v. Montoya,* 81 N.M. 566, 567, 469 P.2d 715, 716 (1970) (holding that a seller could retain liquidated damages provided for in the contract and still obtain additional damages less the liquidated amount); *Suttle v. Bailey,* 68 N.M. 283, 285, 361 P.2d 325, 326 (1961) (holding that property owners could sue for violations of restrictive covenants even though the documents provided for the remedy of reversion in them). It is only when the contract limits the remedies, such as by providing that upon breach by one party, the other party may do either one thing or another, that the cases hold that the non-breaching party's remedies are so limited. *See Roberson,* 81 N.M. at 567, 469 P.2d at 716 (distinguishing *Hopper v. Reynolds,* 81 N.M. 255, 466 P.2d 101 (1970), on this ground). The documents in this case do not contain the sort of language our courts have found to demonstrate an intent to limit the remedies.

{16} Having found that the overwhelming weight of authority and sensible

construction of the bankruptcy documents allow for the lawsuits that were dismissed below, we now proceed to answer the landowners' specific argument that is not already answered by our discussion above. The landowners' primary contentions appear to be that their construction of the bankruptcy documents was a reasonable one, supported by the doctrine of negative inference, *see Patterson v. Globe Am. Cas. Co.*, 101 N.M. 541, 543, 685 P.2d 396, 398 (Ct.App.1984) (indicating that when something is stated somewhere and is missing in other places, we may infer that its absence was intentional in the other places), *superseded by statute on other grounds as stated in Journal Publ'g Co. v. Am. Home Assurance Co.*, 771 F.Supp. 632, 635 (S.D.N.Y.1991), and that it would be inequitable to hold a judicial remedy available to collect the unpaid assessments when substantial support for that remedy is buried in a few places within hundreds of pages of documents. We have discussed negative inference above. Here, we are concerned with equitable considerations.

{17} Regarding equitable considerations, we are compelled to disagree with the basic premises of the landowners' argument. Their view that a judicial remedy is excluded is arrived at by looking at the bankruptcy documents in a most self-interested way and a way that is contrary to the bankrupt becoming an economically viable entity. As we have outlined the documents and the purposes of them, it is clear to us that judicial remedies are not excluded. The facts that the Supplemental Declaration itself uses the term "enforcement," that the term "enforcement" is coupled therein with legal actions, that the plan expressly allows legal actions, and that legal actions would be implied in any event indicate that it would not be inequitable to allow the Resort to sue for nonpayment of assessments that the landowners were mandated to pay. Contrary to the landowners' arguments that the provision for suit is buried in 200 pages of documents and that express provision for suit is not contained in the disclosure statement, the requirement that they pay assessments or face enforcement proceedings in court was not a secret intent unexpressed in the language of the documents. *See Wilcox v. Timberon Protective Ass'n*, 111 N.M. 478, 484, 806 P.2d 1068, 1074 (Ct.App.1990). Instead, the obligation and various methods of enforcement were repeatedly spelled out in the documents, as well as implied by law. In addition, based on our reasonable reading of the documents, there is no ambiguity requiring any interpretation in landowners' favor. Under these circumstances, we cannot say that it would be inequitable or should come as any surprise to landowners to allow these suits.

## CONCLUSION

{18} We reverse the dismissal of the Resort's lawsuits. The Resort asks that we direct that the landowners' affirmative defenses based on the alleged inability to pursue a judicial remedy be dismissed. Upon the documents presented below, including inferences from the financial attachments, we agree with the Resort that a judicial remedy should be held to exist. We therefore remand with instructions to grant the Resort's cross-motion.

{19} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and MICHAEL E. VIGIL, Judges.