2005-NMCA-115

119 P.3d 743

**Thomas ALLEN and Sharon Allen, Plaintiffs/Counterdefendants–Appellees,**

v.

**TIMBERLAKE RANCH LANDOWNERS ASSOCIATION, a New Mexico Non-Profit Corporation, Defendants/Counterclaimant–Appellant.**

**No. 24,710.**

Court of Appeals of New Mexico.

June 28, 2005.

Bruce Boynton, Grants, NM, for Appellees.

John P. Hays, Cassutt, Hays & Friedman, P.A., Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} Defendant, Timberlake Ranch Landowners Association (Association), appeals from a district court judgment, which ruled that Plaintiffs, Thomas and Sharon Allen (Homeowners), were not bound by the obligations of membership in the Association. The district court also ruled that a lien, which the Association had placed on Homeowners' property, was invalid. The Association had placed a lien on Homeowners' property because Homeowners had failed to pay past due assessments to the Association. On appeal, the Association argues that the district court erred because the declaration of covenants (1) imposes an obligation on Homeowners to pay assessments for the maintenance of the subdivision's common areas, (2) provides for the creation of a homeowners' association, which has the authority to collect assessments against lot owners

within the subdivision, and (3) grants the Association the authority to place a lien on Homeowners' property because of Homeowners' failure to pay past due assessments. The Association further argues that Homeowners had notice of the obligation to pay assessments imposed by the declaration of covenants and also had notice of the Association's authority to collect assessments and to place a lien on Homeowners' lot.

{2} We conclude that the declaration of covenants does impose an obligation on Homeowners to pay assessments for the maintenance of common areas within the subdivision. We also conclude that the Declaration grants the Association the power to collect assessments and to place a lien on Homeowners' property because of Homeowners' failure to pay past due assessments. Finally, we hold that Homeowners had notice of the obligations created by the declaration of covenants and the authority of the Association to enforce those obligations, as well as the Association's authority to place a lien on Homeowners' lot for Homeowners' failure to pay their assessments. Accordingly, we reverse the judgment of the district court.

## FACTS AND BACKGROUND

{3} Homeowners own lot 21 in the Cloh Chin Toh Ranch Subdivision (Subdivision). The Subdivision was created by the recording of a plat of survey in the records of Valencia (now Cibola) County on December 6, 1977. The "Declaration of Covenants, Conditions and Restrictions" (Declaration) for the Subdivision was filed in April 3, 1978, by Ramah Lake Venture.

{4} The Declaration's preamble provides that it is "desirable to impose a general plan for the improvement and development" of the Subdivision. The preamble also indicates an intent to establish "covenants, conditions and restrictions" upon each of the Subdivision's lots for the purpose of "enhancing and protecting the value ... and attractiveness" of the Subdivision. Additionally, the preamble states a desire for a homeowners' association to be created with "the powers of maintaining and administering the common area and administering and enforcing these covenants, conditions and restrictions and collecting and disbursing funds pursuant to the assessment

and charges hereinafter created and referred to." Thereafter, the Declaration states that all lots will be subject to "the following covenants ... liens and charges," but there follow no covenants relating to assessments, liens, or charges.

{5} In May 1986, Ramah Lake Venture filed articles of incorporation with the State Corporation Commission to form the Association. The Association became the master homeowners' association for the Subdivision. The Association's bylaws required all lot owners to be members of the Association and to pay assessments for the maintenance of the Subdivision's common areas, which include a lake and bath house, equestrian trails, hiking trails, and a community center. The Association also provides maintenance for roads within the Subdivision. The bylaws also direct the Association to enforce the restrictive covenants contained within the Declaration. Furthermore, Article 4, Section G of the Association's articles of incorporation allows the Association to place a lien on the property of a lot owner if the owner is delinquent in paying the assessment.

{6} Homeowners acquired their initial interest in lot 21 in 1990, when the lot's previous owner, Elmer Chavez, assigned his purchaser's interest in the lot to Homeowners. When Homeowners accepted Chavez's assignment of his purchaser's interest in lot 21, Homeowners signed a document indicating their agreement to be "bound by all the terms, covenants and conditions," which burdened the property at that time.

{7} In 1991, the Association, which had passed from Ramah Lake Venture to the lot owners in the Subdivision, imposed an annual assessment on each of the Subdivision's lots. Homeowners paid the annual assessment levied by the Association from 1991 through 1999. However, in 2000, Homeowners paid only a partial amount of the total annual assessment owed to the Association. After 2000, Homeowners did not pay the annual assessment levied by the Association, because Homeowners believed that only members of the Association were obligated to pay the assessment and Homeowners did not believe that they were members of the Association. Consequently, in May 2001, the Association recorded a claim of lien against Homeowners' lot. In January 2002, Homeowners filed a complaint against the Association. In the complaint, Homeowners sought to quiet the title to their lot by challenging the claim of lien that the Association had placed on the lot. The Association filed an answer to Homeowners' complaint and also filed a counterclaim against Homeowners. In their counterclaim, the Association requested that the district court enter an order awarding the Association the past due assessments owed by Homeowners. The counterclaim also sought a foreclosure of Homeowners' lot.

{8} In December 2002, the district court held a bench trial on the merits of Homeowners' complaint and the Association's counterclaim. During the trial, Homeowners argued that the Declaration did not require the Subdivision's lot owners to be mandatory members of the Association, and therefore membership in the Association was voluntary. Homeowners asserted that they had never consented to be members of the Association. Homeowners further claimed that only members of the Association were obligated to pay assessments for the maintenance of the Subdivision's common areas. Accordingly, Homeowners argued that since they had not consented to be members of the Association, they were not required to pay the assessments. Homeowners also argued that they were not required to pay assessments to the Association because they did not use or receive any benefit from the Subdivision's common areas. Thus, Homeowners claimed that the lien that had been placed on their lot for failure to pay their assessments was invalid.

{9} On the other hand, the Association claimed that the Declaration mandated that Homeowners be members of the Association. The Association further argued that the Declaration provided for the creation of an association, which would have the authority to levy and collect assessments for the maintenance of the common areas. Furthermore, the Association asserted that Homeowners had notice of the obligations created by the Declaration. Thus, the Association argued that the lien that it had placed on Home-

owners' lot was valid because of Homeowners' failure to pay their assessments.

{10} After the trial, the district court entered its findings of facts based on the evidence that was presented at trial. The district court found that the Declaration neither provided for the creation of a homeowners' association nor required the Subdivision's lot owners to be mandatory members of an association. However, the district court did find that the Association was the master homeowners' association for the Subdivision. The district court further found that the Association's bylaws required all lot owners within the Subdivision to be members of the Association and to pay assessments. Furthermore, the district court found that Homeowners had neither utilized the common areas as defined by the Declaration nor received any benefits from membership in the Association.

{11} Based on its findings of fact, the district court concluded, as a matter of law, that there were no covenants running with the land that required Homeowners to be members of the Association. The district court further concluded that although the bylaws of the Association required lot owners to be members of the Association, the bylaws were those of a voluntary association and Homeowners had not consented to be members of the Association. Therefore, the district court concluded that the obligations of membership in the Association were not binding on Homeowners. Thus, the district court ordered that any lien the Association had placed on Homeowners' lot was invalid. The Association appeals from the district court's order.

## DISCUSSION

{12} We will begin our discussion with an analysis of whether the Declaration provides for the creation of a homeowners' association that would have the authority to collect assessments, as well as the authority to place a lien on Homeowners' lot because of Homeowners' failure to pay their assessments. We then proceed to discuss whether the Declaration in this case includes a covenant obligating Homeowners to pay assessments for the maintenance of the Subdivision's common areas. We then turn our attention to an analysis of whether Homeowners' obligation to pay assessments runs with the land or is dependent on Homeowners' being members of the Association. Finally, we analyze whether Homeowners had notice of the Declaration and the burdens it created, as well as the Association's authority to collect assessments and to place a lien on Homeowners' lot.

{13} Prior to beginning our analysis, we first set out the relevant standard of review. The issues presented by this appeal raise mixed questions of law and fact. In cases such as this, we use the substantial evidence standard for review of the facts and then conduct a de novo review of the trial court's application of the law to those facts. *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000–NMSC–033, ¶ 7, 129 N.M. 698, 12 P.3d 960. Conclusions of law by the district court are reviewed de novo. *Prieskorn v. Maloof*, 1999–NMCA–132, ¶ 9, 128 N.M. 226, 991 P.2d 511. We resolve all disputed facts and indulge all reasonable inferences in favor of the trial court's findings. *Sims v. Sims*, 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153.

{14} We next set out the standards that our courts have used when analyzing restrictive covenants such as the one we discuss today. "Restrictive covenants must be considered reasonably, though strictly, and an illogical, unnatural, or strained construction must be avoided." *Montoya v. Barreras*, 81 N.M. 749, 750, 473 P.2d 363, 364 (1970). "In construing a protective covenant, a court is to give effect to the intention of the parties as shown by the language of the whole instrument, considered with the circumstances surrounding the transaction, and the object of the parties in making the restrictions." *Hines Corp. v. City of Albuquerque*, 95 N.M. 311, 313, 621 P.2d 1116, 1118 (1980).

## 1. The Declaration provided for the creation of the Association.

{15} As we mentioned above, the district court found that the Declaration in this case did not provide for the creation of a homeowners' association. However, our review of the record indicates that this finding by the district court is not supported by

substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Collado v. City of Albuquerque,* 2002–NMCA–048, ¶ 15, 132 N.M. 133, 45 P.3d 73.

{16} At trial, the Association entered the Declaration into evidence. Homeowners argued that although the Declaration's preamble states a desire "to create an association," the Declaration never expressly provides for the creation of a homeowners' association. Homeowners conceded that it may have been the "ultimate intention" of Ramah Lake Venture to create an association; yet Homeowners claimed that Ramah Lake Venture's intentions are immaterial and not binding upon Homeowners. In support of their argument, Homeowners directed the district court's attention to our ruling in *Wilcox v. Timberon Protective Association,* 111 N.M. 478, 484, 806 P.2d 1068, 1074 (Ct.App.1990), in which we held that "[t]he secret, unexpressed intentions of the developer are not admissible to interpret the meaning of a covenant running with the land." Homeowners' reliance on the preceding language from *Wilcox* is misplaced.

{17} In *Wilcox,* one of the issues before this Court was whether the term "mobile homes," as used in a restrictive covenant, was ambiguous. *Id.* at 481, 806 P.2d at 1071. In that case, the district court allowed the developer to testify as to whether the use of the term "mobile homes" meant all mobile homes, including those that had been made into permanent structures, or only those that could be easily moved. *Id.* at 483–84, 806 P.2d at 1073–74. We determined that, as a matter of law, the term "mobile homes" was unambiguous. *Id.* at 485, 806 P.2d at 1075. We also concluded that when a restrictive covenant is unambiguous, a court should not look outside the four corners of the document in determining the intent of the covenant. *Id.* It was in this context that we held that "[t]he secret, unexpressed intentions of the developer are not admissible to interpret the meaning of a covenant running with the land." *Id.* at 484, 806 P.2d at 1074. However, in the present case, we need not look outside the Declaration to determine that an

expressed intention of the Declaration is to provide for the creation of a homeowners' association.

{18} Here, the Declaration's preamble clearly states a desire for a homeowners' association to be created with "the powers of maintaining and administering the common area and administering and enforcing these covenants, conditions and restrictions and collecting and disbursing funds pursuant to the assessment and charges." An addendum to the Declaration, filed three months after the Declaration, set aside 500 acres of land as common area. Also, the Declaration defines "association" by providing that " 'Association' shall mean and refer to Cloh Chin Toh Subdivision, a nonprofit association associated under the laws of the State of New Mexico on [sic] its successors and assigns." Furthermore, Article IV, Section 1 of the Declaration grants the Association the authority to enforce the Declaration's restrictive covenants. Article IV, Section 1 reads as follows:

The Association, or any owner or the successor in interest of an owner, shall have the right to enforce by proceedings at law or in equity, all restrictions, conditions, covenants, reservations, liens and charges now or hereafter imposed by the provisions of this Declaration or any amendment thereto, including the right to prevent the violation of any such restrictions, conditions, covenants or reservations and the right to recover damages or other dues for such violation; provided, however, that with respect to assessment liens, the Association shall have the exclusive right to the enforcement thereof.

Thus, our review of the Declaration leads us to conclude that the Declaration clearly expresses an intention to create a homeowners' association.

{19} The only evidence supporting the district court's finding that the Declaration did not provide for the creation of a homeowners' association was the absence within the Declaration of an express provision creating the association that was ultimately established by the Association's articles of incorporation and bylaws. However, as we have stated above, the effect to be given to a restrictive covenant is the intention of the parties as shown

by the language of the whole instrument, considered with the circumstances surrounding the transaction, and the object of the parties in making the restrictions. *Hines Corp.*, 95 N.M. at 313, 621 P.2d at 1118.

{20} In this case, no evidence was presented regarding the circumstances surrounding the drafting of the Declaration. However, as mentioned above, the Declaration, when read as a whole, does not support a finding that the creation of a homeowners' association was not provided for within the Declaration. In addition, the stated object of Ramah Lake Venture in drafting the Declaration also does not support such a finding. The preamble of the Declaration expressly provides that the object of the Declaration is to protect "the value, desirability and attractiveness" of the Subdivision. The preamble goes on to indicate a desire to create an association in order to ensure that the object of the Declaration is carried through. Thus, we hold that the district court erred, due to a lack of substantial evidence, when it found that the Declaration did not provide for the creation of a homeowners' association. We reverse the district court's findings on this matter and rule that the Declaration did provide for the creation of a homeowners' association.

**2. The Declaration grants the Association the authority to levy and collect assessments, as well as place a lien on Homeowners' lot for Homeowners' failure to pay their assessments.**

{21} The district court found that Ramah Lake Venture formed the Association in 1986 to serve as the master homeowners' association for the Subdivision. However, Homeowners argue that the Declaration does not provide the Association with the authority to collect assessments from the Subdivision's lot owners or to enforce any assessment lien against a lot owner who does not pay the assessment levied by the Association. We disagree.

{22} Specifically, Homeowners claim that although the preamble expresses a desire to grant the Association the authority to collect assessments, there are no actual covenants in the body of the Declaration that

provide the Association with the authority to do so. Once again, in construing a restrictive covenant, we must give effect to the intention of the parties as indicated by the language of the whole instrument, the circumstances surrounding the transaction, and the object of the party making the restriction. *Id.* "Imprecision is not fatal to a covenant in a deed." *Leh v. Burke*, 231 Pa.Super. 98, 331 A.2d 755, 759 (1974). "The rule is that if an agreement is not clearly expressed, an effort is made by the court interpreting the language to give effect to the intention of the parties as expressed at the time." *Id.*

{23} Here, the language of the Declaration clearly expresses an intention to grant the Association the authority to levy and collect assessments. The Declaration's preamble expresses a desire to create an association with the power to raise funds necessary for the administration and maintenance of the common areas. Furthermore, the preamble clearly provides that the objective in granting the Association the authority to raise funds is to efficiently preserve the value, desirability, and attractiveness of the Subdivision. Thus, we hold that the Declaration clearly expresses an intention to authorize the Association to collect assessments for maintenance of the Subdivision's common areas.

{24} Furthermore, Article IV, Section 1 of the Declaration clearly grants the Association's predecessor the exclusive right to enforce assessment liens. The Declaration also authorizes that association to enforce "all restrictions, conditions, covenants, reservations, liens and charges." Thus, we determine that the language of the Declaration clearly establishes an intention to allow the Association to place a lien on the lot of an owner who does not pay assessments or refuses to abide by the Declaration's restrictions, conditions, covenants, and reservations.

**3. The Declaration includes a covenant that imposes an obligation on Homeowners to pay assessments for the maintenance of common areas.**

{25} On appeal, the Association argues that the district court erred by not

concluding, as a matter of law, that the Declaration includes a covenant that obligates Homeowners to pay an assessment for the maintenance of the Subdivision's common areas. The Association directs our attention to the portion of the Declaration that reads as follows:

NOW, THEREFORE, Declarant hereby covenants, agrees and declares that:

Cloh Chin Toh Subdivision, each of the lots therein and such additional real property as may be annexed thereto shall be held, sold and conveyed subject to the following covenants, conditions, restrictions, easements, liens and charges which are hereby declared to be for the benefit of the whole subdivision and such additional real property as may be annexed thereto, the owners thereof and their successors and assigns. Said covenants, conditions, restrictions, easements, liens and charges shall run with the said real property and shall be binding on all parties having or acquiring any right, title or interest in said real property or any part thereof and shall inure to the benefit of each owner thereof and are imposed upon said real property and every part thereof as a servitude in favor of each and every parcel thereof as the dominant tenement or tenements.

The Association argues that this language clearly provides that each lot within the Subdivision is subject to a binding obligation to pay assessments.

{26} Homeowners, on the other hand, contend that the language quoted above refers to "the following covenants, ... liens and charges," but point out that no liens or charges actually follow this language. Therefore, Homeowners argue that the Declaration does not impose an obligation on Homeowners to pay assessments. We agree with Homeowners that the paragraph quoted above does not expressly obligate Homeowners to pay assessments; yet we conclude that the Declaration contains an implied covenant that obligates Homeowners to pay assessments for the maintenance of the Subdivision's common areas.

{27} The Subdivision in this case has the characteristics of a common-interest community. The Restatement (Third) of Property: Servitudes § 6.2(1)(a)-(b) (2000) defines a common-interest community as:

a real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude that imposes an obligation that cannot be avoided by nonuse or withdrawal

(a) to pay for the use of, or contribute to the maintenance of, property held or enjoyed in common by the individual owners, or

(b) to pay dues or assessments to an association that provides services or facilities to the common property or to individually owned property, or that enforces other servitudes burdening the property in the development or neighborhood.

{28} In the present case, the Subdivision meets this definition of a common-interest community. As we concluded above, the Declaration authorizes the Association in this case to collect assessments from lot owners for support of the Association's maintenance of the Subdivision's common areas. Furthermore, as we will explain below, even if a lot owner were never to use the Subdivision's common areas, the owner would still be obligated to pay assessments for the maintenance of the common areas; thus, the obligation to pay assessments to the Association cannot be avoided through nonuse of the common areas. Therefore, we determine that the Subdivision is a *common-interest community*.

{29} In *Evergreen Highlands Association v. West*, 73 P.3d 1, 2 (Colo.2003) (en banc) (*Evergreen* ), an issue squarely before the court was whether a homeowners' association could levy assessments against lot owners in order to maintain a subdivision's common areas even if the declaration did not expressly grant the association such power. The court adopted the position of the Restatement (Third) of Property: Servitudes § 6.2 cmt. a, which reads as follows:

An implied obligation may ... be found where the declaration expressly creates an association for the purpose of managing common property or enforcing use restrictions and design controls, but fails to in-

clude a mechanism for providing the funds necessary to carry out its functions. *Evergreen,* 73 P.3d at 8–9.

{30} Here, as we concluded above, the Declaration provides for the creation of an association. The Declaration also states that the Subdivision's lots would be subject to "the following . . . liens and charges," but the Declaration does not include a covenant or provision that actually provides for any actual liens and charges. However, we find support in the holding of *Evergreen* and the Restatement (Third) of Property that the Declaration in our case includes an implied covenant imposing an obligation upon Homeowners to pay the assessments levied by the Association. The Declaration contemplates that an association will have the duty to maintain the common areas, and we determine that it would be unreasonable and illogical for the drafters of the Declaration to place such a burden upon the Association without also providing it with the necessary funds to carry out its duties. *Cf. Angel Fire Resort Operations, L.L.C. v. Corda,* 2005-NMCA–084, ¶¶ 9, 11, 14, 17, 138 N.M. 50, 116 P.3d 841 (2005) (indicating, albeit in the context of bankruptcy reorganization, that when covenants appear quite certainly to create a common-interest community, the obligations thereof may be enforced by legal actions for unpaid assessments). Therefore, we conclude that the Declaration includes an implied covenant that obligates Homeowners to pay assessments for the maintenance of the common areas.

{31} Furthermore, we hold that the obligation to pay assessments is not dependant upon membership in the Association, but arises from the implied covenant within the Declaration. In the present case, the Declaration includes a covenant that clearly states that all liens and charges shall run with the real property and shall be binding on all parties having or acquiring any right, title, or interest in the property. Thus, the Declaration's implied covenant, which obligates Homeowners to pay assessments, is one that runs with the land and is not dependant upon membership in the Association.

{32} In *Sea Gate Association v. Fleischer,* 211 N.Y.S.2d 767, 778–79 (Sup.Ct.1960), the issue before the court was whether residents of the subdivision who were nonmembers of the association had to pay assessments for the maintenance of the common areas. The court held that:

[t]he right of the Association to exercise the control of the easements and to maintain them in condition so that they can be mutually used and enjoyed by all property owners has long been settled by the courts. Inherent in its right of management is the right to maintain. Maintenance costs money. Those who are entitled to enjoy the easements are the ones who must pay the cost of maintenance. Membership in the corporation is not that which gives the right to the property owners to enjoy the easements and services provided by the Association. It is the ownership of property which effects that result.

*Id.* We agree with the holding of *Sea Gate Association.* The obligation to pay assessments does not arise from membership, but rather runs with the land because lot owners in the subdivision are the beneficiaries of the common areas maintained by the association.

4. **Homeowners had constructive notice of their obligation to pay and the Association's right to collect the assessments, as well as the Association's authority to place a lien on Homeowners' lot for Homeowners' failure to pay their assessments.**

{33} Whether parties have been placed on notice of restrictive covenants is a question of fact. *Pollock v. Ramirez,* 117 N.M. 187, 192, 870 P.2d 149, 154 (Ct.App. 1994). In this case, Ramah Lake Venture filed the Declaration with the Valencia County clerk's office on April 3, 1978. Ramah Lake Venture sold lot 21 to Homeowners' predecessor-in-title, Elmer Chavez, on April 10, 1978, which was seven days after the Declaration had been recorded. Homeowners acquired their initial interest in lot 21 in 1990.

{34} The district court did not find, and Homeowners do not argue, that the Declaration in this case was not filed in accordance with NMSA 1978, § 14–9–1 (1991).

Thus, when an instrument is recorded in accordance with Section 14–9–1, NMSA 1978, § 14–9–2 (1915), provides that the instrument "shall be notice to all the world of the existence and contents of the instruments so recorded from the time of recording." The term "all the world" has been limited to mean persons who are bound to search the record, and it is only these persons that the law imputes with constructive notice. *Angle v. Slayton,* 102 N.M. 521, 523, 697 P.2d 940, 942 (1985). Subsequent purchasers are charged with such notice. *Id.*

{35} Here, the Declaration served notice that Homeowners have an obligation to pay assessments, and the Association has a right to place a lien on Homeowners' lot for Homeowners' failure to pay their assessments. The Declaration provided for the creation of the Association, which would have the authority to collect assessments and to place a lien on a lot for an owner's failure to pay the assessments. Furthermore, there was an implied covenant within the Declaration, which runs with the land that obligates Homeowners to pay assessments for the maintenance of the common areas. Therefore, all the essential elements, which lead us to conclude today that the Declaration imposes an obligation on Homeowners to pay assessments and to hold that the lien placed on Homeowners' lot is valid, were included in the Declaration, which served as notice to Homeowners.

**CONCLUSION**

{36} For the foregoing reasons, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.

{37} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.