182 P.3d 814 (2008)
2008-NMCA-051
Quynh TRUONG, Armie Sy, Miranda Daniele, Warren Hopper, Sandra Martinez, And Michael Martinez, Plaintiffs-Appellants/Cross-Appellees,
v.
ALLSTATE INSURANCE COMPANY, a foreign corporation, Defendant-Appellee/Cross-Appellant, and
Computer Sciences Corporation, Intervenor.
No. 26,329.
Court of Appeals of New Mexico.
February 25, 2008.
Certiorari Granted April 15, 2008.
*815 Ronald C. Morgan, Morgan & Macy, Ltd., Whitney Buchanan, Whitney Buchanan, P.C., Albuquerque, NM, Ronald Parry, Parry, Deering, Futscher & Sparks, PSC, Covington, KY, for Appellants/Cross-Appellees.
Lisa Mann, Jennifer A. Noya, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, *816 NM, Floyd P. Bienstock, Bennett Evan Cooper, Jon T. Neumann, Steptoe & Johnson LLP, Phoenix, AZ, for Appellee/Cross-Appellant.
Jay D. Hertz, Sutin, Thayer & Browne, Albuquerque, NM, for Intervenor.
Certiorari Granted, No. 31,013, April 15, 2008.

OPINION
BUSTAMANTE, Judge.
{1} Appellant's motion for rehearing is granted. The opinion filed in this case on November 30, 2007, is withdrawn and this opinion is substituted in its place.
{2} This is a class action case in which Plaintiffs allege, inter alia, that Defendant Allstate Insurance Company's (Allstate) use of a computer program called "Colossus" in its claim handling procedures violates the Unfair Practices Act (UPA), NMSA 1978, {{57-12-1 to -24 (1967, as amended through 2005). Allstate asserts that the UPA does not apply to its use of Colossus under Section 57-12-7, which exempts "actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico." The district court held a three-day bench trial on the regulatory exemption issue and found in Allstate's favor. The district court found that the New Mexico Superintendent of Insurance (SI) ordered a Market Conduct Examination (MCE) of Allstate's claim handling practices in New Mexico, which included consideration of Allstate's use of Colossus in a statistically valid, random sample of claim files. The district court concluded that the SI expressly permitted Allstate's use of Colossus by adopting the final MCE report, which indicated that Allstate's claim handling practices complied with Allstate's policy obligations and with New Mexico law.
{3} The questions presented in this case are: (1) whether Plaintiffs waived their right to a jury trial on the exemption issue, and (2) whether the district court erred in concluding that Allstate's use of Colossus was expressly permitted within the meaning of Section 57-12-7. We affirm and take the opportunity to clarify the analysis under Section 57-12-7 for the "targeted exam" class of regulatory exemption cases.
BACKGROUND
{4} Plaintiffs filed suit against Allstate and others on April 8, 1999, alleging, inter alia, that Allstate made false and/or misleading representations to Plaintiffs regarding the adjustment of their claims in violation of the UPA. More specifically, Plaintiffs asserted that Allstate implemented its Claim Core Process Redesign (CCPR), which included its use of a computer program called "Colossus," in order to pay less on bodily injury claims. The district court certified a class of Allstate automobile policy beneficiaries who made claims for bodily injury in New Mexico from 1995 forward, after Allstate implemented CCPR. The district court defined the class liability issue as: "Did Allstate breach its duty to [its] first party insured by delegating adjustment to a mechanized evaluation system . . . ?"
{5} Following the district court's certification of the class, Allstate filed a motion for summary judgment on the ground that the UPA's regulatory exemption barred the class UPA claim. The district court denied Allstate's motion. However, the district court eventually decided to hold an evidentiary hearingto which the parties also refer as a bench trialin order to resolve whether the regulatory exemption applied to Allstate's use of Colossus. This hearing was to be the first part of a three-phase process the district court proposed to resolve the case. Although Plaintiffs had previously filed a jury demand, they eventually agreed to the district court's proposed method of deciding the regulatory exemption issue in the first phase. The district court held the evidentiary hearing over three days and concluded that the MCE report expressly permitted Allstate's use of Colossus, thus barring Plaintiffs' class claim under Section 57-12-7. More specifically, the district court found the following relevant facts:
5. Allstate uses the Colossus software program to assist claim adjusters with the evaluation of certain first- and third-party bodily injury claims. From information that an adjuster gathers during the investigation of the claim and inputs into the system, the Colossus software generates a recommended range of general damages. *817 The adjuster and the Evaluation Consultant then use their judgment, together with the amount of reasonable and necessary medical expenses and other valid special damages and values generated by Colossus (including any increases or decrease to the range based on their independent judgment and factors that they know Colossus does not consider) to determine the value of the claim (the "Evaluated Amount").
6. On August 19, 1999, the Acting [SI] in New Mexico ordered that a targeted [MCE] of Allstate's claim handling practices in New Mexico be conducted to determine whether Allstate's claims handling practices fulfilled Allstate's contractual obligations to Allstate insured[s] and complied with New Mexico law including, but not limited to, New Mexico's Unfair Insurance Practices Act [UIPA].
7. The [SI's] Order required the [MCE] to be conducted pursuant to the New Mexico Market Conduct Examiner's Handbook, which is based on the National Association of Insurance Commissioners' ("NAIC") Market Conduct Examiner's Handbook.
8. The NAIC Guidelines . . . require that a company's claim handling policies and procedures be tested under the "G Standards," which are claim handling standards tied to the Uniform Unfair Claim Settlement Practices Act adopted in New Mexico as part of the [UIPA].
9. In testing Allstate's CCPR claim handling practices under the G standards, the examiners obtained and reviewed the written claim handling policies and procedures, including the Colossus 4.20 Instructor's Manual, the Colossus 4.30 Manual and the 4.3F Release Training Notes manual, and the CCPR Implementation Training Manual, and tested a statistically valid random sample of various types of claim files.
10. Claim Standard G6 tests whether "[c]laims are properly handled in accordance with policy provisions and applicable statutes, rules and regulations." The G6 standard tests for compliance with the insurer's policy provisions as well as all of New Mexico's insurance statutes and regulations, including all of the subsections of the [UIPA].
11. In conducting a statistically valid [random] sample testing for standard G6, the market conduct examiners reviewed and tested at least 48 claim files on which Colossus had been used  21 "open" files, 27 "litigated" files, and an additional unknown number of "closed" files.
12. The market conduct examiners examined Colossus sufficiently to understand how Allstate used it and to determine that Allstate's use of Colossus complied with [Allstate's] policy provisions and New Mexico law.
13. All [of Allstate's] claim files tested under standard G6 passed  for a 100% pass rate. No violation of any policy provision or New Mexico law, including the [UIPA], was found in the CCPR or Colossus manuals or in any of the claim files tested.
. . . .
15. The market conduct examiners also tested Allstate's claim handling practices under standard G13. That standard tests whether Allstate's claim handling practices "compel claimants to institute litigation, in cases of clear liability and coverage, to recover amounts due under policies by offering substantially less than is due under the policy." Standard G13 objectively tests the reasonableness of Allstate's settlement offers by comparing the pre-litigation offers made by Allstate to settle claims with the amount for which the claim was ultimately resolved after the claimant instituted litigation, by settlement, verdict, or arbitration award. Under standard G13 a statistically valid random sample of litigated files were also tested.
. . . .
17. All litigated files the examiners tested under standard G13 passed with a 100% pass rate. The examiners determined that Allstate's claim valuations under CCPR, including claim valuations made on files in which Colossus was used as a tool, complied with policy provisions and New Mexico law.
. . . .

*818 19. By passing Allstate on all of the claim handling standards tested in the [MCE], the market conduct examiners determined that Allstate's CCPR claim handling practices, including its use of Colossus . . ., fulfilled Allstate's contractual obligations to its policyholders and complied with New Mexico's insurance laws, including the [UPA].
20. [SI] Eric Serna adopted and issued the Final [MCE] Report and made it an official record of the Insurance Division of the New Mexico Public Regulation Commission on December 11, 2002.
The district court's relevant legal conclusions were as follows:
3. The [SI] is vested by the New Mexico Legislature with the authority to regulate Allstate's claim handling practices in New Mexico.
. . . .
5. The [SI]'s actions in adopting, issuing and filing the Final MCE Report . . . permits Allstate to continue using its CCPR [c]laim handling processes including Colossus in New Mexico as set forth in Allstate's CCPR and Colossus manuals and as used in the claim files that were examined in which Colossus was used.
6. The New Mexico [UPA] exemption provision states: "Nothing in the [UPA] shall apply to actions or transactions expressly permitted under the laws administered by a regulatory body of New Mexico[.]"
7. Because the Final [MCE] Report . . . found that Allstate's CCPR claim handling practices, including its use of Colossus as a tool in adjusting claims, complied with policy provisions and New Mexico law, and adopted the "Pass" grades on all of the claim handling standards, the [SI] has permitted Allstate to continue using Colossus in New Mexico and the [UPA] exemption operates to bar the class claim certified by this Court in the Class Certification Order.
. . . .
10. Individual claims [against Allstate] should continue in order to determine if other liability exist[s] for [alleged] acts by Allstate which fall outside of the [MCE] approved by the [SI].
The district court entered a partial judgment regarding the Phase One trial on August 24, 2005. Plaintiffs timely appealed from that decision and from several orders denying their post-judgment motions.
{6} On appeal, Plaintiffs assert that: (1) the evidentiary hearing went beyond the issue presented by the motion for summary judgment and intruded into the constitutional function of the jury, and (2) the district court erred as a matter of law in concluding that the MCE report constituted express permission within the meaning of Section 57-12-7. In contrast, Allstate claims that: (1) the district court properly conducted a bench trial on the applicability of Section 57-12-7, which was a full trial on the merits and not an extension of the summary judgment proceedings, (2) Plaintiffs waived their right to a jury trial on the regulatory exemption issue by participating in the bench trial without objection, and (3) the district court correctly decided that the SI's adoption of the MCE report constituted express permission within the meaning of Section 57-12-7. For the reasons set forth below, we hold that Plaintiffs waived their right to a jury trial on the regulatory exemption issue and that the district court's conclusion regarding express permission was not contrary to law and was supported by substantial evidence. We therefore do not address Allstate's conditional cross-appeal regarding the district court's class certification order.
{7} Additionally, we hold that Plaintiffs' briefing of the issues regarding their post-judgment motions was insufficient under Rule 12-213 and we therefore do not address those issues. Rule 12-213(A)(4) NMRA requires that the brief in chief contain
an argument which, with respect to each issue presented, shall contain a statement of the applicable standard of review, the contentions of the appellant and a statement explaining how the issue was preserved in the court below, with citations to authorities and parts of the record proper, transcript of proceedings or exhibits relied on.
*819 (Emphasis added.) "The argument must set forth a specific attack on any finding, or such finding shall be deemed conclusive." Id. Although Plaintiffs discuss certain evidence they acquired following the phase one trial, they do not explain why the district court erred in denying their motion under Rule 1-060 NMRA. Instead, Plaintiffs simply assert in footnote 30 of their brief in chief that the trial court abused its discretion in denying the motion, followed by a citation to a case with no explanatory parenthetical.
DISCUSSION
1. Waiver of the Right to Jury Trial
{8} The idea of the "phase one" bench trial evolved in a way that somewhat muddies the issue of whether Plaintiffs waived their right to a jury trial on the exemption issue. Allstate raised its regulatory exemption defense in its summary judgment motion. The district court entered an order denying the motion on July 23, 2003. However, at a hearing taking place on the same day, the district court offered to hold an evidentiary hearing to resolve the factual issues that were raised in connection with Allstate's exemption defense. The district court indicated that it would certify the exemption issue for interlocutory appeal immediately if Allstate wished to pursue an appeal right away, but also suggested that an evidentiary hearing would allow it to issue findings of fact and conclusions of law prior to Allstate's appeal.
{9} On August 7, 2003, Allstate attempted to accept the district court's offer to hold an evidentiary hearing by filing a pleading styled as "Allstate Insurance Company's Acceptance of the Court's Offer of an Evidentiary Hearing on Defendant Allstate Insurance Company's Motion for Summary Judgment and Request for Modification of the Court's July 23, 2003 Order." Allstate filed its application for interlocutory appeal with this Court shortly thereafter because it was concerned that the district court would not act on Allstate's "acceptance" pleading until after the deadline for Allstate to file the appeal. Plaintiffs filed a response in opposition to the "acceptance," asserting, among other things, that it is the jury's role to decide disputed issues of fact.
{10} This Court denied Allstate's application for interlocutory appeal on August 26, 2003. On March 9, 2004, Allstate filed a "Renewed Motion to Accept the Court's Offer of an Evidentiary Hearing on Defendant Allstate Insurance Company's Motion for Summary Judgment" in which it urged the district court to withdraw its order denying summary judgment and to hold the proposed evidentiary hearing. Plaintiffs then filed a reply on April 5, 2004, opposing the withdrawal of the prior order as well as the evidentiary hearing. Plaintiffs asserted that "an evidentiary hearing is antithetical to an entitlement to summary judgment," and that "[t]he question of whether a regulator `expressly permitted' the action of a regulated business, is purely a question of law: only a judge would be empowered to decide [that issue]." On April 20, 2004, Allstate filed a reply in which it clarified that it was not seeking reconsideration of the order denying summary judgment and that the evidentiary hearing was still necessary "(1) to create a complete and proper record on which the Court of Appeals can consider the issues raised in Allstate's Motion for Summary Judgment; and (2) to provide clear guidance to the parties regarding the issues that need to be addressed at trial."
{11} The district court held a hearing on May 19, 2004, in which it heard, among other things, arguments regarding the proposed evidentiary hearing. Early in the hearing the district court asked counsel for Allstate whether the proposed hearing would be "jury or nonjury." Counsel responded: "I think we have assumed all along it would be in front of Your Honor." The district court stated: "That was my thought, but I just didn't know." Two pages later in the transcript, at the very beginning of his responses, counsel for Plaintiffs stated: "And, Your Honor, just addressing the question you raised, I understood [counsel for Defendant] to explain that this hearing would be before the Court and not a jury, which would certainly be my understanding as well if it were to occur."
{12} After making that statement, Plaintiffs' counsel continued for a number of pages *820 explaining why a hearing was not necessary or was inappropriate. Plaintiffs' counsel suggested that the narrowing of issues for trial before a jury could be accomplished in other ways. For example, Plaintiffs' counsel suggested that "this is a matter that could be easily handled at a scheduling conference where the parties would brief in advance the . . . evidentiary issues that they think need to be tried in a jury trial."
{13} In partial response to Plaintiffs' argument, the district court stated:
In looking at your using this transcript from a deposition, it reinforces my concern about what the [SI] did or didn't authorize, and what facts they have to rely on in giving whatever stamp of approval they did. That was my concern and the reason for bringing up a prehearing where we could dispose of a lot of that . . . and make rulings and findings and go forward, because if you get to the jury on something this complex, you are going to  if you don't do some of this stuff ahead of time, you're going to be into a pretty long trial on issues that I think are legal and should be decided by the Court.
{14} Plaintiffs' counsel responded: "Your Honor, I'm not disputing your [sic] validity of what you are saying at all. What I'm suggesting is do we really have to do it in a formal evidentiary hearing setting? Can't these issues be aired out in another manner? They can submit the best stuff their experts say, we submit the best stuff ours say, we brief it, come in and talk to you about it, and you decide what the factual issues are before the jury?" The district court then explained that an evidentiary hearing would provide "a better record and gives me a chance to make some findings and conclusions that I'm not sure I can do just off transcripts . . . in an appropriate way." Plaintiffs' counsel acknowledged the district court's position by saying "Okay, sir."
{15} After a lengthy discussion concerning prehearing discovery and other logistical issues and after argument on class notice issues, the district court asked for the parties' thoughts on the effect the hearing might have on the jury trial on the merits. Allstate's counsel responded at length about the salutary effects of narrowing jury issues for a bifurcated trial in which Allstate's exemption defense would be heard first. Near the end of his presentation, Allstate's counsel posited the possibility that the district court would find express approval of Colossus by the SI, thus obviating any need for further trials.
{16} Plaintiffs' counsel started his response to the district court's inquiry by saying:
[Counsel]: Your Honor, we understand that this evidentiary hearing will lead the Court to decide what extent the evidence concerning Allstate's defense that the superintendent's conduct or the [MCE] Report permitted Allstate to use Colossus. This is a defense, and we believe it turns well-established trial procedures on its head to try this issue as a lone issue, as an isolated issue. And presumably [P]laintiffs wouldn't even be able to introduce evidence that Colossus unlawfully and incorrectly calculates general damages in this first phase of the trial; that is an issue reserved for the next phase of the trial. But I'm getting a bit ahead of myself. I thought the Court had decided  maybe that is a strong word  but certainly had indicated that whatever the [SI] expressly permitted was a question of law for the Court. And we submit that is correct, and that a jury would not be needed in a Phase One proceeding to decide if the [SI] expressly permitted their use of Colossus. That is a Court decision.
Later, counsel for Plaintiffs stated, "I think it's very important . . . that we leave here today knowing whether the Court will decide as a matter of law what the [SI] expressly permitted or not."
{17} Reacting to counsel's answers, the district court engaged in a colloquy with Plaintiffs' counsel as follows:
[Court]: Let me interrupt you for a second, so I can give you directions. I already know where I'm going, and I see where both of you differ. It's my intention at the fall hearing this year that the Court will find as a matter of law what *821 the [SI] permitted. So that is not going to be a jury issue that is going to be retried in Phase One that has been referred to by the [D]efendant. The jury trial that eventually comes up will try Allstate's use of Colossus. That is what you referred to.
[Counsel]: Yes, sir.
[Court]: Obviously that's going toif I find that the Superintendent of Control [sic] allowed the total use that you guys are complaining about, you may not have a case.
[Counsel]: Yes, sir.
[Court]: But if I don't find that, you are going to go to the jury trial, Phase One of that jury trial, as you have referred to it, being the [P]laintiffsAllstate's actual use of Colossus
[Counsel]: Okay, sir.
[Court]: . . . and then Phase Three, and I'm thinking that it would be nice to bifurcate it but keep the same jury at a trial on individual claims.
Just before the end of the hearing, counsel for Allstate sought further clarification from the court by asking the following:
[Counsel]: This bench trial in October, if there are any fact issues, you are going to decide them and then apply the law on the [MCE]; is that correct?
[Court]: We're going to rule as a matter of law what the [SI] did or did not permit . . . [a]nd that encompasses factual issues that would be the basis of his decision, what facts he had, what's the interpretative meaning of his letter.
[Counsel]: You will make a ruling with findings of fact and conclusions of law . . . whether [the SI] expressly did it or didn't expressly permit it?
[Court]: Right.
. . . .
[Counsel]: If you find in our favor in Phase One, we don't have Phase Two; we just have individual claims?
[Court]: Right.
Plaintiffs' counsel posed no objection to the district court's explanation. Further, Plaintiffs never posed any objection to the non-jury form of the hearing until after the district court made its decision following the hearing.
{18} On appeal, Plaintiffs argue that the district court went beyond the scope of summary judgment proceedings by deciding questions of fact in the bench trial in violation of Plaintiffs' right to a trial by jury. Thus, Plaintiffs' argument is premised on their understanding of the bench trial as an extension of the summary judgment proceedings. Accordingly, Plaintiffs assert that the district court violated the standards for summary judgment in conducting the bench trial. Plaintiffs also maintain that they alerted the district court to their jury demand when the idea of the "Phase One" hearing was first introduced.
{19} In contrast, Allstate asserts that Plaintiffs waived their right to a jury trial on the exemption issue. Allstate acknowledges that Plaintiffs alluded to their right to a jury trial in an August 27, 2003, pleading. However, Allstate points out that Plaintiffs changed their position regarding the UPA claim when they told the district court that the exemption issue would be "a court determination, not a jury determination." Additionally, as mentioned previously, the district court made it clear that it would decide facts relating to the exemption issue at the bench trial. Plaintiffs did not object or reiterate their jury demand following the district court's clarification of the scope of the proposed hearing.
{20} Allstate argues that two legal authorities support a finding of waiver in this context: (1) Rule 1-038 NMRA, and (2) Hull v. Feinstein, 2003-NMCA-052, 133 N.M. 531, 65 P.3d 266. Rule 1-038(D)(5) provides that a party can waive his or her right to a jury trial by, among other things, oral consent in open court. In Hull, this Court held that a party's conduct could also indicate waiver. Hull, 2003-NMCA-052, ¶ 10, 133 N.M. 531, 65 P.3d 266. Hull involved a plaintiff who failed to object when the district court stated that it would set the case for a bench trial. Id. ¶ 11. Although the defendant in Hull had filed a jury demand, which would have entitled the plaintiff to a jury trial, this Court held that the plaintiff had waived her right to *822 a jury trial by participating in the bench trial without objection. Id. ¶¶ 1, 12. Allstate argues that Plaintiffs in the present case waived their right to a jury trial even more clearly than the plaintiff in Hull because of Plaintiffs' affirmative statements to the district court that it should decide, as a matter of law, whether the regulatory exemption applied and that a jury would not be necessary for the court to make that decision.
{21} Plaintiffs' reply brief reasserts their position that summary judgment was the "procedural vehicle" used to obtain the hearing. Plaintiffs also cite authority supporting the proposition that there is a presumption against waiver of the right to a jury trial. See, e.g., Jennings v. McCormick, 154 F.3d 542, 545 (5th Cir.1998) (explaining that courts must "indulge every reasonable presumption against waiver." (internal quotation marks and citation omitted)); Tray-Wrap, Inc. v. Six L's Packing Co., 984 F.2d 65, 68 (2d Cir.1993) ("[T]he conduct said to constitute a waiver must be clear and unequivocal, as waivers are never to be lightly inferred."). Moreover, Plaintiffs argue that they understood that the hearing was intended to identify triable issues of fact. Curiously, however, Plaintiffs continue to maintain that the exemption issue is a question of law to be resolved by the judge and not a jury.
{22} Plaintiffs' position does not square with the district court's stated intent to find facts relating to the exemption defense before making legal conclusions. The portions of the record cited above demonstrate that Plaintiffs knew the district court intended to find facts, explicitly agreed with the process and failed to object before receiving an adverse ruling. The bench trial appears to have been exactly what the district court said it would be, i.e., the actual trial on the exemption issue. Plaintiffs presented fact and expert witnesses and later submitted proposed findings of fact and conclusions of law; if Plaintiffs had wanted a jury to decide those facts, they should have objected. Instead, Plaintiffs waited until they lost on the exemption issue before resurrecting their jury demand.
{23} Plaintiffs' assertion that the bench trial was an extension of the summary judgment proceedings is untenable in light of the following facts: (1) the district court denied Allstate's motion for summary judgment; (2) the district court never vacated or reopened the order denying summary judgment; (3) the bench trial included fact-finding, which, as Plaintiffs observe, is not consistent with summary judgment proceedings; and (4) the district court did not enter a new order granting summary judgment following the bench trial but instead entered findings of fact and conclusions of law, followed by its entry of a partial judgment.
{24} Finally, Plaintiffs cite no authority to suggest that the district court lacked the discretion to hold the Phase One bench trial following its denial of summary judgment. But see Belser v. O'Cleireachain, 2005-NMCA-073, ¶ 3, 137 N.M. 623, 114 P.3d 303 ("A district court has control over proceedings before it."); Pizza Hut of Santa Fe, Inc. v. Branch, 89 N.M. 325, 327, 552 P.2d 227, 229 (Ct.App.1976) ("[T]rial courts have supervisory control over their dockets and inherent power to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.").
{25} Accordingly, we hold that Plaintiffs willingly and knowingly participated in the non-jury trial. Plaintiffs' acts were sufficient under Hull to constitute a waiver of their jury demand on the exemption issue.
{26} We agree with the tenor of the dissent's concern for protecting the right to jury trial. Trial by jury occupies an important if not exalted position in our system of adjudication, and we are committed to its protection. Our review here recognizes and honors the importance of trial by jury. We do not give short shrift to the high showing necessary to find a waiver.
{27} Thus, we do not disagree with the general standards for assessing a claim of waiver in the cases cited by the dissent. The general statements found in them are not substantively different from the standard set by our case law, including Hull. The particular holdings of the cases are of limited value in that claims of waiver are necessarily dependent on facts and circumstances unique to each case. For example, the dissent cites *823 Tray-Wrap, Inc. There the appellate court held that evidence short of an express waiver in "open court" or "entered in the record" was not enough to overcome a clear objection at a pretrial conference and at the beginning of the trial. Tray-Wrap, Inc., 984 F.2d at 68. If we had similar facts here, our result would undoubtedly be different; but we do not have similar facts.
{28} Our facts compel us to disagree with the dissent's reading of the record. The record does not reflect an abrupt or untoward action by the district court. The nature of the hearing discussed at the May 19, 2004, hearing evolved over time. We perceive no duress on the part of the district court; rather its understanding of the hearing evolved along with that of counsel. To find no waiver on this record requires a change in the standard applied to such questions. The dissent seems to seek a strict formal adherence to the Rule's requirement. Iconic formality of that type is not required in New Mexico or in the federal courts. See Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1018 (2nd Cir.1989) (noting that waiver of a jury demand in federal courts can be based on conduct.) We see no need to impose it here.
2. Regulatory Exemption Under the UPA
{29} The UPA's regulatory exemption provides that the UPA does not apply to "actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico." Section 57-12-7. This case presents us with the question of whether a regulatory agency's targeted examination and approval of a regulated entity's activities can amount to "express permission" within the meaning of Section 57-12-7 where the agency considers the specific action or transaction that allegedly violates the UPA as part of its examination, but does not mention the specific action or transaction by name in its final report. This appears to be an issue of first impression in New Mexico. As mentioned above, the district court found that "[t]he market conduct examiners examined Colossus sufficiently to understand how Allstate used it and to determine that Allstate's use of Colossus complied with [Allstate's] policy provisions and New Mexico law." Based on this and other factual findings, the district court concluded as a matter of law that the SI's adoption of the final MCE report constituted express permission for Allstate to continue using Colossus in New Mexico.
{30} We review the district court's findings of fact using the deferential substantial evidence standard, while we review the district court's application of law to those facts de novo. See Allen v. Timberlake Ranch Landowners Ass'n, 2005-NMCA-115, ¶ 13, 138 N.M. 318, 119 P.3d 743. "We resolve all disputed facts and indulge all reasonable inferences in favor of the trial court's findings." Id. Additionally, the district court's interpretation of the UPA is a matter of law that we review de novo. See State v. Rivera, 2004-NMSC-001, ¶ 9, 134 N.M. 768, 82 P.3d 939.
A. The District Court Correctly Applied Section 57-12-7
{31} We begin our inquiry into the meaning and scope of the UPA exemption provision by first looking to the statute itself. Id. ¶ 10 ("The starting point in every case involving the construction of a statute is an examination of the language utilized by [the Legislature] in drafting the pertinent statutory provisions.") (alteration omitted) (internal quotation marks and citation omitted). "Under the plain meaning rule of statutory construction, [w]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." Id. (alternation in original) (internal quotation marks and citation omitted). "[W]hen the statute is ambiguous, we may . . . consider the policy implications of the various constructions of the statute." Id. ¶ 14.
{32} The parties' respective approaches to the question of express permission in this case differ substantially, which suggests that the phrase "expressly permitted" in Section 57-12-7 is not clear. Plaintiffs assert that the MCE report did not constitute express permission because it did not specifically mention Colossus, and because Donald Koch, the author of the report, testified that the examiners did not look at Colossus closely *824 enough to "exonerate" Allstate's use of it under the UPA. In contrast, Allstate maintains that the examiners were aware of Allstate's use of Colossus, looked at Colossus specifically in conjunction with the examination, tested a random sample of claims files and concluded that Allstate's claim handling procedures passed the exam. Allstate further argues that it was unnecessary for the examiners to understand the precise algorithms and programming of Colossus; rather, the important point is that the examiners looked at Colossus in the context of Allstate's broader scheme of handling claims and approved that broader scheme. Neither interpretation of "expressly permitted" is unreasonable on its face.
{33} The parties' differing approaches to this issue underscore the importance of how a reviewing court frames the question regarding express permission in the "targeted exam" context. On its face, the question of whether the SI expressly permitted the use of Colossus seems to call for a different kind of analysis than the question of whether the SI expressly permitted Allstate's claim handling procedures, which include the use of Colossus. Both questions are potentially misleading. The former question invites a court to look narrowly at the MCE report's express treatment of Colossus (or lack thereof) while ignoring the broader context of the SI's approval of Allstate's overall claim handling scheme. The latter question poses the danger of glossing over whether the examiners actually looked at Colossus and considered Allstate's use of it before giving Allstate a "clean bill of health." The present case therefore demonstrates the need for a rule of analysis that avoids both overly broad and overly narrow approaches to the question of express permission in the "targeted exam" context.
{34} Unfortunately, the relevant case law in this area does not set forth such a nuanced rule for the "targeted exam" class of regulatory permission cases. Instead, the majority of cases deal with general claims of permission that do not involve an agency's specific examination of a particular defendant's conduct. The cases, however, do counsel in favor of carefully tailoring the scope of inquiry under Section 52-12-7.
{35} In State ex rel. Stratton v. Gurley Motor Co., 105 N.M. 803, 804, 737 P.2d 1180, 1181 (Ct.App.1987), the State alleged that the defendant car dealer violated the UPA by taking illegal insurance premium rebates from the co-defendant insurance company. The defendant car dealer argued that it was exempt from the UPA under Section 57-12-7 because it was an affiliate of the co-defendant insurance company, which was subject to the regulation of the SI. State ex rel. Stratton, 105 N.M. at 807, 737 P.2d at 1184. This Court held that exemption under Section 57-12-7 requires "more than the mere existence of a regulatory body. . . . At a minimum, the regulatory body must actually administer the regulatory laws with respect to the party claiming the exemption." State ex rel. Stratton, 105 N.M. at 807, 737 P.2d at 1184. Because the car dealer was not licensed as an insurer, it could not claim that it had permission "through licensing, registration or some similar manifestation of `permitting' the business activity." Id.
{36} In Campos v. Brooksbank, 120 F.Supp.2d 1271, 1272-73 (D.N.M.2000), the plaintiffs claimed that the defendant attorney violated the UPA when he executed a false affidavit in a debt collection action against them. The defendant filed a motion to dismiss, arguing that Section 57-12-7 exempted him from the UPA's coverage because he was an attorney "engaging in activities which are regulated and licensed by the State Bar of New Mexico and the New Mexico Supreme Court." Id. at 1275. The court denied the motion, reasoning that New Mexico law required "a showing that (1) the defendant's activities generally are subject to regulation by an appropriate state or federal agency and (2) the specific activity which would otherwise constitute a violation of the [UPA] is in fact `permitted' by the applicable law or regulation." Id. at 1276 (internal quotation marks and citation omitted). The court stated that "[t]he filing of affidavits . . . within the context of litigation [is] permitted by the relevant regulatory body, but misleading a court and abusing the discovery process are not." Id. at 1277 (citation omitted). Significantly, *825 the court warned against an overly general definition of "action or transaction" and emphasized that the manner in which a defendant conducts an ordinarily acceptable activity may affect whether or not the activity is permitted. Id. at 1277-78. The court also indicated that the underlying purpose of the regulatory function could play a role in deciding the issue of preemption. See id. Thus, he appeared to recognize that the Supreme Court's determination for disciplinary purposes whether the attorney's acts were permitted by the rules was sufficiently distinct from a court's purpose in enforcing the UPA, and, therefore, that preemption was not appropriate. See id. at 1278.
{37} Plaintiffs in the present case cite one "targeted exam" case that is nearly on point: Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, 133 N.M. 669, 68 P.3d 909. Plaintiffs cite Azar as support for their argument that the phrase "actions or transactions expressly permitted" should be narrowly construed in order to promote the legislative purpose of the UPA, which is to protect consumers. See id. ¶ 68. Azar involved a class action against an insurance company in which the plaintiff class members asserted that the insurer failed to adequately disclose the additional cost of "modal" premiums in violation of the UPA. Id. ¶ 1. None of the applications for insurance that the insurance company provided to the plaintiffs disclosed that modal premiums were higher than annual premiums for the same policy. Id. ¶ 9. The New Mexico Insurance Division approved the policy forms in question, determining that they complied with the New Mexico Insurance Code. Id. The insurer argued, inter alia, that the Insurance Division expressly permitted the sale of the insurer's policies because it approved the policies. Id. ¶ 66. This Court rejected the insurer's argument because, while the Insurance Division administers the regulatory laws governing the issuance of insurance policies in New Mexico, it "has never specifically addressed the subject of modal premiums. . . . Thus, it does not appear that the challenged activity . . . is `expressly permitted' by the Insurance Division." Id. ¶ 68.
{38} Azar addresses what is not express permission in a targeted exam case, but it provides little guidance with regard to what does qualify as express permission. Allstate argues that Azar is distinguishable from the present case because, in Azar, the alleged violative "action or transaction"modal premiumswere not disclosed to the regulator. In contrast, Allstate disclosed its use of Colossus to the Insurance Division, which actually considered some aspects of Colossus in conducting its examination of Allstate's claim handling procedures. Although Azar appears distinguishable on this basis, the question still remains whether the SI's approval of the MCE report means that the Insurance Division "specifically addressed" the subject of Colossus. See Mulford v. Altria Group, Inc., 506 F.Supp.2d 733, 759 (D.N.M.2007) (noting that "the absence of a formal regulation is not dispositive of whether an agency `expressly permitted' an action or transaction, so long as the agency `specifically addressed the subject' in some other way").
{39} While the New Mexico cases discourage overly general definitions of "action or transaction," several "targeted exam" cases from other jurisdictions warn against using a definition that is too narrow. For example, in Kraft v. Detroit Entertainment, L.L.C., 261 Mich.App. 534, 683 N.W.2d 200 (2004), the plaintiff alleged that the defendants' slot machines misled consumers about their chances of winning in violation of Michigan's Consumer Protection Act (MCPA) in that the machines were programmed so that the chances that the wheel would stop on a high payoff space were significantly less than for lower payoff spaces. Id. at 202. The Michigan Court of Appeals held that the defendants met the MCPA's regulatory exemption because the Michigan Gaming Control Board (MGCB) had approved the slot machines at issue. Id. at 203. The plaintiff argued that the exemption did not apply because she was challenging the defendants' advertising and promotion of the slot machines, which the MGCB did not regulate. Id. at 204. However, the court cited Michigan case law holding that, "in determining whether a transaction or conduct is `specifically authorized' by law, the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is *826 `specifically authorized.' Rather, it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct is prohibited." Id. (emphasis added) (internal quotation marks and citation omitted). The Court concluded that "the general conduct involved in this case the operation of slot machinesis regulated and was specifically authorized by the MGCB." Id. The court noted that "the MCGB puts gaming devices through rigorous randomness testing and ensures that the rules of the game are clearly displayed and are not confusing or misleading." Id. at 205. Significantly, however, the court did not mention whether the MGCB had released a report showing the test results for the defendants' slot machines, nor did it indicate whether the MGCB looked at the particular elements of the machines' programming about which the plaintiff complained.
{40} The court in InMed Diagnostic Services, L.L.C. v. MedQuest Assocs., Inc., 358 S.C. 270, 594 S.E.2d 552, 555 (Ct.App.2004) also resisted an overly narrow definition of "actions or transactions" and instead deferred to the agency's expertise in regulating the general transaction. InMed Diagnostic Services involved a dispute between competing providers of magnetic resonance imaging (MRI) services. Id. at 553. The plaintiff alleged, inter alia, that the defendant provided false information to the state regulatory agency in charge of approving the acquisition of medical equipment to be used for diagnosis or treatment in violation of South Carolina's consumer protection law (UTPA). Id. at 554. The plaintiff argued that the regulatory exemption in the UTPA should not apply to the defendant because South Carolina law did not permit the provision of deceptive information to the regulatory agency. Id. at 555. However, the South Carolina Court of Appeals concluded that the plaintiff's interpretation of the law was "unduly narrow." Id. "Whether [the defendant] submitted accurate information in support of its . . . applications was necessarily for [the agency] to determine as part of the administrative process in deciding whether or not to grant such applications." Id. "We agree with [the defendant] that the regulatory exemption . . . is based on the concept that the legislature has determined certain matters are appropriate for resolution by administrative agencies with particular expertise, rather than by the general jurisdiction of a trial court." Id.
{41} Some cases suggest that the mere existence of a regulatory exemption indicates a legislative intent to defer to agency policy when an agency has spoken on the issue. See, e.g., Price v. Philip Morris, Inc., 219 Ill.2d 182, 302 Ill.Dec. 1, 848 N.E.2d 1, 38 (2005) (concluding that the regulatory exemption in the Illinois Consumer Fraud Act "reflects a legislative policy of deference to the authority granted by Congress or the [legislature] to federal and state regulatory agencies and a recognition of the need for regulated actors to be able to rely on the directions received from such agencies without risk that such reliance may expose them to tort liability"); InMed Diagnostic Servs., 594 S.E.2d at 555.
{42} Other cases emphasize that regulatory exemptions are intended to avoid conflict between laws by offering protection from suits based on conduct which has been approved or defined as proper by an agency charged with regulatory oversight of that activity. See, e.g., Ward v. Dick Dyer & Assocs., Inc., 304 S.C. 152, 403 S.E.2d 310, 312 (1991) (holding that a car dealership was not exempt from South Carolina's Unfair Trade Practices Act simply because it was subject to some state regulation which did not specifically deal with the defendant's alleged wrongful conduct).
{43} New Mexico has not taken the path of broad regulatory exemption based on the mere existence of a regulatory structure. Rather, it has chosen to look for evidence that the regulating agency has actually considered the conduct at issue. Our cases have not contented themselves with asking whether the general transaction is allowed or addressed by the regulator. We do not retreat from that posture. But adhering to the narrower form of exemption as a matter of policy does not by itself answer the specific question posed by this case.
{44} Judicial resolution of the tension between regulatory, primary, and individual claims of improper conduct must take into *827 account and balance legislative intent, the purpose and intent of regulatory action, and the actual facts of the regulatory process when it is aimed at a particular activity or actor.
{45} These considerations support the conclusion that neither a bright line rule requiring the explicit naming of the specifically contested action or transaction nor a sweeping rule providing blanket protection for any regulated activity will suffice in this context. A bright line rule would detract from the legislative intent of deferring to regulatory agencies because it would require the agencies to enumerate (to an unknowable degree of specificity) each component part of an approved general transaction in order to avoid judicial interference with the regulation in question. A sweeping rule would undercut the broader policy of the UPA, which is to protect consumers.
{46} We think the better rule is that, for the "targeted exam" class of regulatory exemption cases, agency approval of a broad process can constitute "express permission" where the agency explicitly considers the specific, allegedly violative action or transaction as a part of its examination and approval of the regulated entity's broader conduct. Under these circumstances, the agency's approval of the broader conduct provides a reasonable degree of assurance that it also approved the specific action or transaction. Put another way, if the specific action or transaction were to have a materially harmful impact on consumers, deference would require a reviewing court to assume that the regulators would observe the harmful impact and hesitate to approve the broader conduct. For example, if Allstate's use of Colossus were to result in unfair claim handling, one would expect the random sample of claim files examined in the MCE report to reveal this effect and negatively impact Allstate's performance on the exam. However, if the specific action or transaction is harmful in a way that does not affect the general conduct subject to regulation, and the regulators fail to sufficiently examine the specific action or transaction, then the Azar rule controls and there cannot be express permission. We note that, in the present case, Plaintiffs' claim is that Allstate's use of Colossus actually results in the unfair handling of claims, which is precisely the topic that the MCE was intended to address. Thus, the purpose of the regulatory activity matches the purpose of the UPA claim brought by the Plaintiffs.
{47} We hold that a regulatory agency expressly permits an action or transaction within the meaning of Section 57-12-7 where: (1) the agency conducts a targeted examination of the defendant's broader conduct, (2) included in that examination is an explicit consideration of the specific action or transaction that allegedly violates the UPA, and (3) the agency explicitly approves the broader conduct in an official report. The question of what constitutes "express permission" in this context is a mixed question of fact and law. The question of fact concerns the nature and extent of the regulatory agency's examination of the allegedly violative action or transaction. The question of law is whether the agency's examination of the specific action or transaction is sufficient to constitute express permission where the agency approves of the broader process encompassing the specific action or transaction.
B. Substantial Evidence Supports the District Court's Application of Section 57-12-7
{48} Applying the foregoing analysis in the present case, we hold that substantial evidence supports the district court's conclusion that the SI expressly permitted Allstate's use of Colossus. The district court held a bench trial spanning three days in which it heard testimony and examined evidence on this issue. Allstate presented the testimony of some of its employees regarding their knowledge and use of Colossus, as well as their interactions with the MCE examiners. Allstate also presented testimony from an industry expert on MCEs, as well as the testimony of an expert statistician regarding the statistical inferences that can be drawn from the MCE data. Finally, Plaintiffs presented the testimony of Donald Koch, the leader of the MCE exam team and author of the final MCE report.
*828 {49} Plaintiffs raise two evidentiary points on appeal: (1) no statement in the MCE report permits Allstate's use of Colossus, and (2) the MCE examiners did not examine Colossus closely enough to "legitimize" it. Plaintiffs' first argument has no merit; we have already concluded as a matter of law that the regulatory exemption does not require that the MCE report mention Colossus by name. Regardless of whatever inferences one can draw from the report's failure to name Colossus, such evidence does not address the question of whether substantial evidence supports the district court's decision. See H-B-S P'ship v. Aircoa Hospitality Servs., Inc., 2005-NMCA-068, ¶ 34, 137 N.M. 626, 114 P.3d 306 ("In reviewing for substantial evidence, we view the evidence in the light most favorable to the prevailing party and disregard evidence or inferences to the contrary.").
{50} Plaintiffs' second evidentiary issue goes more to the heart of the analysis we have articulated today. The critical question is whether the examiners considered Colossus closely enough such that their approval of Allstate's overall claim handling processes could reasonably be said to include Allstate's use of Colossus. Plaintiffs submitted the affidavit of Mr. Koch, which indicated that the MCE was critical of Allstate's use of Colossus and that the examiners did not examine Colossus at all. However, in his deposition testimony introduced at trial, Mr. Koch admitted that these statements in his affidavit were incorrect. Mr. Koch further testified that he conducted the MCE according to NAIC protocols, which included examination under each of the NAIC "G" standards. The district court, in its role as fact-finder, was entitled to assess Mr. Koch's credibility and weigh his conflicting statements in light of the rest of the evidence. Viewing the evidence in the light most favorable to Allstate, we conclude that substantial evidence supports the district court's judgment.
CONCLUSION
{51} We affirm the district court's judgment that Allstate's use of Colossus falls within the regulatory exemption of the UPA. The New Mexico Insurance Division conducted a targeted exam of Allstate's claim handling practices, which included consideration of Allstate's use of Colossus. The SI's decision to adopt the final MCE report constituted express permission for Allstate to continue handling claims in the manner that was approved in the MCE report. While this holding is dispositive of the class claim certified by the district court, it does not dispose of any pending individual claims that are not based on Allstate's alleged violation of the UPA.
{52} IT IS SO ORDERED.
I CONCUR: JAMES J. WECHSLER, Judge.
MICHAEL E. VIGIL, Judge (dissenting).
VIGIL, Judge (dissenting).
{53} Plaintiffs filed a motion for rehearing, and after considering the motion, I conclude that in our original opinion, we overlooked the applicable standards in determining whether, by their conduct, Plaintiffs waived their constitutional right to a jury trial. I would therefore grant rehearing, reverse, and remand with instructions to grant Plaintiffs a jury trial.
{54} This case presents the question of whether the district court deprived Plaintiffs of their constitutional right to have a jury resolve disputed facts. Specifically, Allstate raised the affirmative defense that Plaintiffs' class action claim as to Colossus was barred under the regulatory exemption which provides that the UPA shall not "apply to actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico." Section 57-12-7. The facts to determine whether the statutory exemption applies are disputed. Nevertheless, after first denying Allstate's motion for summary judgment on this question, the district court on its own motion ordered that a non jury evidentiary hearing be held. The district court then decided the factual dispute in Allstate's favor, and dismissed Plaintiffs' class action claim.
{55} I conclude that the record fails to establish conduct by Plaintiffs which is sufficiently clear and unequivocal to establish a *829 knowing, voluntary, and intelligent waiver of their constitutional right to a jury trial. In other words, the presumption against a waiver of Plaintiffs' constitutional right to a jury trial was not overcome.
{56} I begin with the constitutional right. The right to a jury trial in a civil case has been guaranteed by the United States Constitution since 1792 in the Bill of Rights. The Seventh Amendment directs, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. Since statehood, our constitution has guaranteed that "The right of trial by jury as it has heretofore existed shall be secured to all and remain inviolate." N.M. Const. art. II, {12. It has long been established that "[T]he right of jury trial is fundamental, [and] courts indulge every reasonable presumption against waiver." Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937). The reason why there is a presumption against a waiver of the right has also been long established:
The right of trial by jury is of ancient origin, characterized by Blackstone as the `glory of the English law' and `the most transcendent privilege which any subject can enjoy' (Bk.3, p. 379). . . . With, perhaps, some exceptions, trial by jury has always been, and still is, generally regarded as the normal and preferable mode of disposing of issues of fact in civil cases at law as well as in criminal cases. Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.
Dimick v. Schiedt, 293 U.S. 474, 485-86, 55 S.Ct. 296, 79 L.Ed. 603 (1935).
{57} Plaintiffs filed a timely jury demand and otherwise perfected their constitutional right to a jury trial in accordance with the Rules of Civil Procedure. Moreover, Allstate does not dispute that Plaintiffs' claim is one which is properly the subject of a jury trial. What Allstate does assert, and what the majority concludes, is that Plaintiffs' conduct demonstrated and established a waiver of their constitutional right to a jury trial. I respectfully submit that under the appropriate standard, we cannot conclude Plaintiffs waived their constitutional right to a jury trial. This record fails to affirmatively demonstrate a knowing, voluntary waiver of the right.
{58} The party asserting the waiver of a fundamental right has the burden of demonstrating that there was a knowing and voluntary waiver of the right. In reviewing whether this burden has been satisfied, we are required to "indulge every reasonable presumption against waiver." Aetna Ins. Co., 301 U.S. at 393, 57 S.Ct. 809. In Hull, 2003-NMCA-052, ¶ 10, 133 N.M. 531, 65 P.3d 266, we stated that the right to a jury trial may be waived "if a party's conduct amply demonstrates that the party intended to waive the right to jury trial[.]" In order for a party's conduct to "amply demonstrate" an intent to waive a jury trial and overcome the presumption against waiver, the conduct must clearly, explicitly, and unequivocally signal that the constitutional right to a jury trial is waived. See Middle Tenn. News Co. v. Charnel of Cincinnati, 250 F.3d 1077, 1084 (7th Cir.2001) ("Conduct must clearly and explicitly signal a waiver, and there must be clear, unequivocal evidence of a waiver, before we will find that a party intended to waive its right to jury trial.") (internal quotation marks and citation omitted); Tray-Wrap, Inc., 984 F.2d at 68 ("[T]he conduct said to constitute a waiver [of the right to a jury trial] must be clear and unequivocal, as waivers are never to be lightly inferred."); Seong v. Trans-Pacific Airlines, Ltd., 41 Haw. 231, 241 (1955) ("[I]n order to create a waiver [of the right to a jury trial] by implication unequivocal acts are necessary to be shown.") (internal quotation marks and citation omitted). The necessity that conduct meet this standard is reflected in our Rules of Civil Procedure which provide that one way to waive trial by jury is by "oral consent, in open court, entered on the record." Rule 1-038(D)(5).
*830 {59} Allstate raised its regulatory exemption defense in a motion for summary judgment, and Plaintiffs' response to the motion demonstrated that there were disputed issues of material fact. At a hearing to determine whether Allstate should be allowed to seek an interlocutory appeal of the order denying summary judgment, the district court stated:
My thoughts were there might be a point where we did some kind of hearing on those factual issues that you've raised in regard to that report, what it covered, what was presented, and all the other issues that you want to raise in regard to the report itself, so that I could make findings and conclusions in regard to the report and come to a decision on whether the report is binding or not, so that it's a discretionary call that's either supported by facts or not supported by facts. And that might be the time for your interlocutory [appeal.]
{60} After the order was filed denying Allstate's motion for summary judgment, Allstate filed a pleading stating it "accepts the Court's July 23, 2003[,] offer set an evidentiary hearing on Allstate's [m]otion for [s]ummary [j]udgment." Allstate further requested that the district court "remove the interlocutory appeal language so that the Court may hold an evidentiary hearing and enter appropriate Findings of Fact and Conclusions of Law in advance of Allstate's interlocutory appeal from the Court's denial of Allstate's Motion for Summary Judgment."
{61} Plaintiffs objected to Allstate's attempt to hold an evidentiary hearing on the motion for summary judgment, because the motion for summary judgment was already denied, and because "[t]he evidentiary hearing would invade the rights of the parties to a jury trial." Plaintiffs further asserted, "Allstate has ignored the jury demand and its role to decide disputed issue[s] of fact."
{62} After this Court denied Allstate's application for interlocutory appeal, Allstate filed a "Renewed Motion to Accept the Court's Offer of an Evidentiary Hearing on Defendant Allstate Insurance Company's Motion for Summary Judgment." Again, Allstate requested that the district court withdraw its previous order denying Allstate's motion for summary judgment and "reissue an Order on Allstate's Motion, along with appropriate findings of fact and conclusions of law, after the evidentiary hearing."
{63} Plaintiffs again objected, stating that Allstate was attempting to "repeat its effort at obtaining summary judgment by crafting a phase of litigation that would involve a discovery process, a three-day hearing, the submission of proposed findings of fact and conclusions of law, another summary judgment order, and a potential interlocutory appeal." Furthermore, Plaintiffs argued, "an evidentiary hearing is antithetical to an entitlement to summary judgment[.]"
{64} In reply, Allstate said that it was not asking the district court to reconsider its prior order denying Allstate's motion for summary judgment. Instead, Allstate asserted it was seeking a hearing "(1) to create a complete and proper record on which the Court of Appeals can consider the issues raised in Allstate's Motion for Summary Judgment; and (2) to provide clear guidance to the parties regarding the issues that need to be addressed at trail."
{65} At the hearing on Allstate's motion, Allstate's counsel asserted that the district court had previously suggested that an evidentiary hearing would be in order to determine what fact issues there were to determine whether the superintendent of insurance had expressly permitted Allstate to continue to use Colossus as it was using Colossus. Allstate's counsel argued that holding the hearing would not result in any delay "because assuming after the hearing you identify one or two evidentiary issues, that then we know what to focus on in the trial of that and it will streamline the trial." Allstate's counsel continued:
My understanding of this type of proceeding under Rule 56, it is often helpful for courts, even if they deny an important motion for summary judgment where they realize the issues are going to be tried, to take the time to identify the factual issues in dispute and enter findings of fact and conclusions of law. We recognized that *831 when you said on the record this was a pivotal issue and it's a good thing to do, it's the province of the Court. This is not a motion for reconsideration. This is a logical step in Rule 56 proceedings where the Courtand I think it's clear that it's an important issue, and we obviously think it should have come out the other waybut even if it stays this way, which we assume it will, we think you entering findings of fact and conclusions of law as to exactly what fact issues are in dispute regarding the market conduct exam will expedite the trial and focus it and it's in the interests of the [c]ourt and all the parties.
{66} At one point, referring to Allstate's proposed scheduling order which referenced a "Phase One Trial," Plaintiffs' counsel stated, "I'm not sure what exactly is being proposed." Counsel added, "I would suggest if we're just going to identify issues, I would ask why judicial resources and the parties' resources are really needed in the formal setting of an evidentiary hearing? It would seem to me this is a matter that could be easily handled at a scheduling conference where the parties would brief in advance the issues, those evidentiary issues that they think need to be tried in a jury trial." Plaintiffs' counsel added:
Your Honor, I'm not disputing your validity of what you are saying at all. What I'm suggesting is do we really have to do it in a formal evidentiary hearing setting? Can't these issues be aired out in another manner? They can submit the best stuff their experts say, we submit the best stuff ours say, we brief it, come in and talk to you about it, and you decide what the factual issues are before the jury?
The district court responded, "I would rather do it formally because it gives you a better record and gives me a chance to make some findings and conclusions that I'm not sure I can do just off of transcripts."
{67} In the course of discussing a discovery schedule and other matters, Allstate's counsel said:
[T]here are two fact issues that the trier needs to decide in Phase One and those are the two fact issues that are going to go to the jury in Phase One. Once they decide that, [you] apply the law and . . . tell [us] whether or not the [SI] has expressly permitted Colossus. Once the jury decides those two fact issues, once you apply the law, then we all know whether we need Phase Two, because if you say based on how the jury resolved the fact issues that you identified, [i]t's clear to me that the [SI] did expressly permit Allstate to continue using Colossus as it is doing to this very day with the [SI]'s knowledge, and we don't need to go to Phase Two[.]
{68} The district court then abruptly, and without notice to either party, stated on its own motion that it intended to decide the factual issues in the following colloquy with Plaintiffs' counsel:
THE COURT: Let me interrupt you for a second, so I can give you directions. I already know where I'm going, and I see where both of you differ. It's my intention at the fall hearing this year that the Court will find as a matter of law what the [SI] permitted. So that is not going to be a jury issue that is going to be retried in Phase One that has been referred to by [D]efendant. The jury trial that eventually comes up will try Allstate's use of Colossus. That is what you referred to.
[COUNSEL]: Yes, sir.
THE COURT: Obviously that's going to-if I find that the Superintendent of Control [sic] allowed the total use that you guys are complaining about, you may not have a case.
[COUNSEL]: Yes, sir.
THE COURT: But if I don't find that, you are going to go to the jury trial, Phase One of that jury trial, as you referred to it, being the [P]laintiffs-Allstate's actual use of Colossus 
[COUNSEL]: Okay, sir.
{69} Thereafter, the district court advised Allstate's counsel as follows:
[COUNSEL]: Your Honor, I wanted to get a little clarification on your ruling which is going to bifurcate so I have a little better understanding. This bench trial in October, if there are any fact issues, you are going to decide them and then apply the law on the [MCE]; is that correct?

*832 THE COURT: We're going to rule as a matter of law what the [SI] did or did not permit.
[COUNSEL]: Okay.
THE COURT: And that encompasses factual issues that would be the basis of his decision, what facts he had, what's the interpretative meaning of his letter.
[COUNSEL]: You will make a ruling with findings of fact and conclusions of law that we've been talking about, whether [the SI] expressly did it or didn't expressly permit it?
THE COURT: Right.
[COUNSEL]: Then we're going to have Phase Two which will be the class issue that will get tried?
THE COURT: And that's Allstate's actual use of Colossus.
[COUNSEL]: Right. If it's needed?
THE COURT: Right.
[COUNSEL]: If you find in our favor in Phase One, we don't have Phase Two; we just have individual claims?
THE COURT: Right.
{70} In my view, the Plaintiffs' conduct did not explicitly, clearly, and unequivocally signal an intent to waive a jury trial to a sufficient degree to overcome the presumption against a waiver of the right.
{71} Plaintiffs perfected their constitutional right to a jury trial in accordance with the Rules of Civil Procedure. Allstate's motion for summary judgment was denied after the district court recognized there were material issues of fact for the jury to decide in determining whether Allstate had a valid statutory defense. When Allstate first requested that the district court conduct a non jury evidentiary hearing related to the disputed facts, Plaintiffs objected in writing because "Allstate has ignored the jury demand and its role to decide disputed issue[s] of fact," and "the evidentiary hearing would invade the rights of the parties to a jury trial." This was all Plaintiffs had to do to preserve their objection, and Plaintiffs were not required to repeat the same objection each time the issue was raised.
{72} In DiPirro v. Bondo Corp., 153 Cal. App.4th 150, 62 Cal.Rptr.3d 722 (2007), the plaintiffs filed a complaint for injunctive relief and civil penalties against the defendant, alleging a violation of the California Safe Drinking Water and Toxic Enforcement Act of 1986. Id. at 731. As in this case, the defendants asserted a statutory exemption. Id. at 732. The parties stipulated to a bifurcation of the proceedings and agreed to have trial of the statutory defense heard first. Id. Thereafter, upon motion of the defendant, which the plaintiff objected to in writing, the trial court struck the plaintiff's demand for a jury trial, and the defense was heard by the trial court, sitting without a jury. Id. at 741. The trial court had given a tentative ruling that the defendant's motion would be granted, and the plaintiff did not appear at the hearing to consider the defendant's motion. Id. The California Court of Appeals held that the plaintiff's written objection to a denial of his right to a jury trial was itself sufficient to preserve the objection, and appearing at the hearing to repeat the same opposition was not necessary. Id. at 743. Furthermore, the court concluded, no waiver would result from going to trial after an erroneous denial of a jury trial. Id. at 742.
{73} The purpose of the evidentiary hearing was constantly being changed. At first, it was proposed for the district court to determine what the specific issues of fact and law were so this Court could, in turn, decide in an interlocutory appeal whether Allstate was properly denied summary judgment. Then, Allstate proposed that the evidentiary hearing be held as an extension of the summary judgment proceeding to enable the district to make findings of fact and conclusions of law and thereby identify the disputed factual issues for trial. Finally, the district court, on its own motion, and without notice to the parties, announced it would conduct a non jury evidentiary hearing and decide the disputed facts related to Allstate's statutory defense. The district court and Allstate were keenly aware of Plaintiffs' jury demand and Plaintiffs' objection to any invasion of the parties' constitutional right to a jury trial to decide the disputed factual issues. Under the circumstances, Plaintiffs were not required to repeat the same objections each *833 time the proposed purpose of the non jury evidentiary hearing changed. Id. at 743.
{74} When the district court abruptly, without notice, and on its own motion declared its intention to Plaintiffs' counsel, the responses, "Yes, sir," and "Okay, sir," are at best equivocal. Zidell Explorations, Inc. v. Conval Int'l, Ltd., 719 F.2d 1465, 1469 (9th Cir.1983) holds that such equivocal remarks of counsel will not suffice to waive the right to trial by jury. During the course of a jury trial, the trial court told counsel that it would decide a factual issue (capacity to conspire to violate the federal antitrust laws), not the jury. Id. In response to the court's ruling, counsel said, "Well, if that be the case, that's fine, Your Honor." Id. The remarks could have been interpreted either as a waiver of the right to a jury determination of that issue or a "mere acquiescence in the trial judge's directive." Id. Since "a waiver of the right to trial by jury on an issue so triable must be clearly proved [and] equivocal remarks will not suffice," the ambiguity was resolved against inferring waiver. Id.
{75} Plaintiffs' counsel was silent after the district court stated to Allstate's counsel its intent to decide the factual issues in a non-jury evidentiary hearing. Silence, however, is inherently ambiguous and of dubious probative value. See State v. Gutierrez, 2007-NMSC-033, ¶ 12, 142 N.M. 1, 162 P.3d 156 (recognizing the "dubious probative value" of silence upon arrest, given its ambiguous nature) (quoting Doyle v. Ohio, 426 U.S. 610, 617 n. 8, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)); State v. Romero, 94 N.M. 300, 302, 609 P.2d 1256, 1258 (Ct.App.1980) ("[S]ilence is insolubly ambiguous.") (internal quotation marks omitted). Again, this ambiguity must be construed against a waiver.
{76} Plaintiffs participated in the three-day evidentiary hearing ordered by the district court. I do not deem this compliance with the district court order to constitute a waiver of the jury trial that Plaintiffs demanded. Plaintiffs were not required to walk out of the courtroom and refuse to participate in the court-ordered hearing to preserve their objection. A similar circumstance confronted the Second Circuit Court. After concluding that the trial court erroneously deprived the plaintiffs of their right to a jury trial, the Court stated that the plaintiffs "were not required to walk out of the courtroom rather than to proceed with the bench trial in order to preserve their right to claim on appeal that they had been denied the jury trial that had been demanded." Gargiulo v. Delsole, 769 F.2d 77, 79 (2d Cir.1985). DiPirro, 62 Cal.Rptr.3d at 742 (concluding that no waiver would result from participating in the hearing after an erroneous denial of a jury trial).
{77} Finally, because a fundamental right is involved, to the extent that there is any doubt about whether Plaintiffs waived their constitutional right to a jury trial, I resolve that doubt in their favor. See id. at 741 (stating that as a basic and fundamental part of our system of jurisprudence, trial by jury must be jealously guarded by the courts, and in case of doubt, the issue should be resolved in favor of preserving a litigant's right to a jury trial); Zidell Explorations, Inc., 719 F.2d at 1469 (holding ambiguous remarks of counsel construed against a waiver of the right); McAfee v. U.P. Martin, 63 F.3d 436, 437 (5th Cir.1995) (holding that because the right to a jury trial is a fundamental right and courts should indulge every reasonable presumption against waiver, a waiver should not be found in a doubtful situation).
{78} Contrary to the majority, I do not read this record to demonstrate that Plaintiffs' understanding of the nature of the hearing changed over time, much less that Plaintiffs agreed. At best, this record shows that the court's intent changed, and that it then directed that a hearing be held accordingly. Contrary to our established standards, the majority would require Plaintiffs to repeatedly repeat their objection that the proposed hearing would violate their constitutional right to a jury trial. Contrary to our established standards, the majority would require Plaintiffs to affirmatively demonstrate that they did not waive their constitutional right to a jury trial. When the district court directed that the nature of the hearing was going to be different than what was originally proposed, and it was going to decide the disputed issues of material fact rather than the jury, it was incumbent upon the district *834 court to secure a knowingly, voluntary waiver of the constitutional right on the record to overcome the presumption against a waiver. This is not mere "iconic formality"; it is nothing more than proper and adequate assurance that Plaintiffs in fact waived their right to have a jury decide the facts of this case as guaranteed by the United States Constitution and New Mexico Constitution. Merely complying with the order of the district court does not satisfy our standards for waiving a constitutional right.
{79} I conclude that under the applicable standard of review discussed above, the record fails to establish that by their conduct Plaintiffs waived their fundamental, constitutional right to have the jury decide the facts concerning Allstate's regulatory exemption defense. Since the majority disagrees, I dissent, and express no opinion on the merits of the district court's decision concerning Allstate's defense. I would reverse and remand the case to the district court with instructions to grant Plaintiffs a jury trial.